1

**HELTON LAW GROUP**
**A PROFESSIONAL CORPORATION**
KIM WOROBEC (SBN 220035)
kworobec@helton.law
RYAN JACOBSON (SBN 270188)
rjacobson@helton.law
ATTORNEYS AT LAW
1590 Corporate Drive
Costa Mesa, CA 92626
TELEPHONE: (562) 901-4499
FACSIMILE: (562) 901-4488

2

3

4

5

6

7   ATTORNEYS FOR PLAINTIFF

8                  **UNITED STATES DISTRICT COURT**

9                  **CENTRAL DISTRICT OF CALIFORNIA**

10

11   UNIVERSITY OF SOUTHERN
CALIFORNIA on behalf of its KECK          Case No:  2:23-CV-04540
12   HOSPITAL OF USC and on behalf of its
USC NORRIS COMPREHENSIVE
13   CANCER CENTER,                            **COMPLAINT; DEMAND FOR JURY TRIAL:**

14                  Plaintiff,

15   vs.                                        1. **BREACH OF IMPLIED-IN-LAW CONTRACT (Emergency Services)**
16   LOCAL INITIATIVE HEALTH                    2. **BREACH OF IMPLIED-IN-LAW CONTRACT (Post-Stabilization Services)**
AUTHORITY FOR LOS ANGELES
17   COUNTY dba LA CARE HEALTH                  3. **BREACH OF IMPLIED-IN-FACT CONTRACT (Post-Stabilization Services)**
PLAN; and DOES 1 through 25, inclusive,
18                                              4. **BREACH OF IMPLIED-IN-FACT CONTRACT (Elective Services)**
19                  Defendants.                 5. **QUANTUM MERUIT**
6. **NEGLIGENCE UNDER GOV. CODE § 815.6 (Emergency Services)**
20                                              7. **NEGLIGENCE UNDER GOV. CODE § 815.6 (Post-Stabilization Services)**
21                                              8. **NEGLIGENCE UNDER GOV. CODE § 815.6 (Elective Services)**
22                                              9. **VIOLATION OF 42 U.S.C. § 1983**
23

24

25

26   TO ALL INTERESTED PARTIES AND THEIR ATTORNEYS OF RECORD:

27          1.      Plaintiff UNIVERSITY OF SOUTHERN CALIFORNIA on behalf of its

28   KECK HOSPITAL OF USC and on behalf of its USC NORRIS COMPREHENSIVE

---

CANCER CENTER, (hereinafter "Plaintiff" or Hospitals") bring this action against Defendants LOCAL INITIATIVE HEALTH AUTHORITY FOR LOS ANGELES COUNTY dba LA CARE HEALTH PLAN (hereinafter "LA Care") and Does 1 through 25 for failure to pay $2,038,788.53 for medical services Plaintiff provided to 13 enrollees (the "Patients") of Defendant's health care service plan.

## THE PARTIES

2.     Plaintiff UNIVERSITY OF SOUTHERN CALIFORNIA on behalf of its KECK HOSPITAL OF USC and on behalf of its USC NORRIS COMPREHENSIVE CANCER CENTER (collectively "Plaintiff" or "Hospitals") is a California non-profit public benefit corporation with its principal place of business in the city of Los Angeles, County of Los Angeles, State of California. Plaintiff operates in the City of Los Angeles two acute-care hospital facilities licensed by the California Department of Public Health: Keck Hospital of USC ("Keck") and USC Norris Comprehensive Cancer Center ("Norris").

3.     Defendant LA Care is a public entity. Plaintiff is informed and believes that LA Care is licensed by the Department of Managed Health Care ("DMHC") to operate as a health care service plan pursuant to the Knox-Keene Health Service Plan Act of 1975 ("Knox-Keene Act"), Health and Safety Code Sections 1340, *et seq.* and the regulations promulgated thereunder. At all times referenced in this complaint, LA Care's principal place of business is in the County of Los Angeles.

4.     The Hospitals are unaware of the true names, identities, and capacities of the Defendants sued herein as Does 1 through 25, inclusive, and each of them as based thereon, sue said defendants by such fictitious names. When their true names and capacities are ascertained, the Hospitals will amend this complaint by inserting their true names and capacities herein. The Hospitals are informed and believe and thereon allege that each of the fictitiously named Defendants is responsible in some manner for the occurrences alleged herein, and that the Hospitals' damages as alleged herein were proximately caused by those Defendants.

COMPLAINT; DEMAND FOR JURY TRIAL

5.   Hospitals are informed and believe and thereon allege that at all times mentioned herein, each of the Defendants, including all Defendants sued under fictitious names, were the agent and/or employee of each of the remaining Defendants, and in so doing the things alleged herein, were acting within the scope of his, her or its agency and employment, and with the permission and consent of the other defendants.

6.   LA Care and Does 1 through 25 are collectively referred to herein as "Defendants."

7.   The Hospitals are withholding the full names of the patients addressed in this complaint to preserve the patients' protected rights to privacy concerning health care information. Patients will refer to the patients individually as Patients 1 through 13, and to the patients collectively as the "Patients."  The Patients' medical and claims information have been, and/or will be made available to Defendants upon request.

8.   The Hospitals bring this action against Defendants for their failure to fully reimburse the Hospitals for the medically necessary and physician ordered services provided to the Patients.

9.   The Hospitals submitted timely claims for reimbursement to Defendants for the services provided to Patients 1 through 13.  Defendants acknowledged their financial obligations by making partial payments on the claims for Patients 1 through 13.

10.   The Hospitals submitted written appeals to Defendants requesting reasonable reimbursement for the services provided to the Patients 1 through 13. Appeals were futile.  Defendants upheld their determinations to underpay and/or deny payment to the Hospitals for the medically necessary services provided to the Patients.

11.   Plaintiff presented to Defendants timely written notification of intent to pursue legal action in compliance with the claim presentation requirements of California's Government Claims Act (Govt. Code. §§ 910. et seq.). In each instance, Defendants rejected Plaintiff's claims or failed to respond within the statutory period.

COMPLAINT; DEMAND FOR JURY TRIAL

After exhausting all available administrative remedies, Plaintiff brings this complaint within the statutory time frame as required by the Government Claims Act.

## CALIFORNIA LAW

12.     The Knox-Keene Health Care Service Plan Act of 1975 ("Knox-Keene Act"), Health and Safety Code sections 1340, *et seq.*, is a system of licensing and regulation under the jurisdiction of the DMHC.

13.     The Knox-Keene Act compels licensed health care service plans to reimburse emergency health care providers for healthcare services provided to enrollees.

14.     For purposes of the Knox-Keene Act, the term "health care service plan" includes "any person who undertakes to arrange for the provision of health care services to subscribers or enrollees, or to pay for or to reimburse any part of the cost for those services, in return for a prepaid or periodic charge paid by or on behalf of the subscribers." (Health & Safety Code § 1345(f)(1)).

15.     Health and Safety Code section 1371.4 provides, in pertinent part:

> (b) A health care service plan, or its contracting medical providers, shall reimburse providers for emergency services and care provided to its enrollees, until the care results in stabilization of the enrollee, except as provided in subdivision (c). As long as federal or state law requires that emergency services and care be provided without first questioning the patient's ability to pay, a health care service plan shall not require a provider to obtain authorization prior to the provision of emergency services and care necessary to stabilize the enrollee's emergency medical condition.

> (c) Payment for emergency services and care may be denied only if the health care service plan, or its contracting medical providers, reasonably determines that the emergency services and care were never performed; provided that a health care service plan, or its contracting medical providers, may deny reimbursement to a provider for a medical screening examination in cases when the plan enrollee did not require emergency services and care and the enrollee reasonably should have known that an emergency did not exist. …

16.     Pursuant to Health and Safety Code section 1262.8, if once the emergency medical condition of a patient has been stabilized and noncontracting hospitals, such as

COMPLAINT; DEMAND FOR JURY TRIAL

Plaintiff, are able to obtain the name and contact information of the patient's health care service plan that requires prior authorization for post-stabilization care, the noncontracting hospitals are obligated to contact the patient's health care service plan for authorization to provide post-stabilization care.  Upon request of the health care service plan, or the health plan's contracting medical provider, the noncontracting hospitals are required to provide to the plan or contracting medical provider the treating physician's diagnosis and any other relevant information reasonably necessary for the health care service plan or the plan's contracting medical provider to decide whether to authorize post-stabilization care or to assume management of the patient's care by prompt transfer.

    17.    Health and Safety Code section 1262.8 further provides, in pertinent part:

> …(d) (1) A health care service plan, or its contracting medical provider, that is contacted by a noncontracting hospital [with a request for authorization of post-stabilization services] shall, within 30 minutes from the time the noncontracting hospital makes the initial contact, do either of the following:
>
> (A) Authorize poststabilization care.
>
> (B) Inform the noncontracting hospital that it will arrange for the prompt transfer of the enrollee to another hospital.
>
> (2) If the health care service plan, or its contracting medical provider, does not notify the noncontracting hospital of its decision pursuant to paragraph (1) within 30 minutes, the poststabilization care shall be deemed authorized, and the health care service plan, or its contracting medical provider, shall pay charges for the care, in accordance with the Knox-Keene Health Care Service Plan Act of 1975 (Chapter 2.2 (commencing with Section 1340) of Division 2) and any regulation adopted thereunder.
>
> ….
>
> (4) If the health care service plan, or its contracting medical provider, provides authorization to the noncontracting hospital for specified poststabilization care and services, the health care service plan, or its contracting medical provider, shall be responsible to pay for that authorized care.
>
> ….

COMPLAINT; DEMAND FOR JURY TRIAL

18.     If the health care service plan or its contracting medical provider notified the noncontracting hospital that it would assume management of the patient's care by prompt transfer, but either the health care service plan or its contracting medical provider fails to transfer the patient within a reasonable time, the post-stabilization care shall be deemed authorized, and the health care service plan, or its contracting medical provider, shall pay charges for the care until the enrollee is transferred. *See also* Health & Safety Code § 1371.4, and Title 28, CCR §§ 1300.71.4(b)(3), (c) (requiring health care service plans to either authorize post-stabilization hospital services or transfer the patient to an in-network facility).

19.     The Knox-Keene Act and DMHC regulations <u>require</u> that health care service plans, such as LA Care, operating a health maintenance organization reimburse each complete claim, or portion thereof, no later than forty-five working days after the date of receipt of the complete claim.  (Health and Safety Code § 1371; and Title 28 Cal. Code Regs. § 1300.71(g).)

20.     DMHC regulations specifically define the term "Reimbursement of a Claim," in the case of noncontracted providers and contracted providers without a written contract as "the payment of the reasonable and customary value for the health care services rendered based upon statistically credible information that is updated at least annually and takes into consideration: (i) the provider's training qualifications, and length of time in practice; (ii) the nature of the services provided, (iii) the fees usually charged by the provider; (iv) prevailing provider rates charged in the general geographic area in which the services were rendered; (v) other aspects of the economics of the medical provider's practice that are relevant; and (vi) any unusual circumstances in the case…." (Title 28 Cal. Code Regs. § 1300.71(a)(3) (hereinafter referred to as "Rule 1300.71(a)(3) (defining "Reimbursement of a Claim")).

21.     The "reasonable and customary value" for the services provided to Defendants' members, the Patients who are the subject of the claims at issue in this matter, is the total amount of billed charges.

22.     Plaintiff is entitled to reimbursement at the reasonable and customary rate for the emergency, post-stabilization and non-emergent/elective hospital services Plaintiff provided to Defendants' enrollees pursuant to the Knox-Keene Act.

23.     DMHC, unlike the courts, lacks the authority to set specific reimbursement rates under theories of quantum merit and the jurisdiction to enforce a reimbursement determination on both the provider and the health plan (*Bell v. Blue Cross of California*, (2005) 131 Cal.App.4th 211, 218).

## THE PATIENTS

24.     **Patient 1** transferred from the emergency room at Providence Holy Cross Medical Center to Keck for a higher level of care for emergency services.  Patient 1 was admitted to the intensive care unit ("ICU") and Plaintiff provided medically-necessary hospital services for treatment of multiple emergency medical conditions, including but not limited to dissection of aorta, thoracoabdominal, without mention of rupture (I71.03), Sepsis due to Enterococcus (A41.81), and Acute and subacute infective endocarditis (I33.0).

25.     Plaintiff is informed and believes, and on that basis alleges, that at or near the time Patient 1's emergency medical condition stabilized, Plaintiff notified Defendants of Patient 1's admission to Keck and requested authorization of post-stabilization services.

26.     Plaintiff is informed and believes, and on that basis alleges, that Defendants failed to respond to the request for authorization within 30 minutes, and thus Plaintiff's provision of post-stabilization services to Patient 1 was deemed authorized.  Additionally, Plaintiff is informed and believes, and on that basis alleges, that Defendants chose to leave Patient 1 at Keck for all medically necessary post-stabilization services the patient required, rather than assume management of Patient 1's care through transfer to a contracted hospital.

27.     Plaintiff is informed and believes, and on that basis alleges, that, after the 30 minutes for Defendants' response to the request for authorization already had run,

COMPLAINT; DEMAND FOR JURY TRIAL

Defendants requested clinical reviews and/or medical records and Plaintiff promptly forwarded them.

28.     Plaintiff is informed and believes, and on that basis alleges that, several days after Plaintiff requested authorization and forwarded clinical reviews and/or medical records, Defendants issued an authorization number indicating Defendants agreed services Plaintiff provided to Patient 1 were medically necessary and provided at the appropriate level of care, and that Defendants would pay Plaintiff for the hospital services.  Plaintiff is informed and believes, and on that basis alleges that, Defendants never during Patient 1's inpatient stay at Keck communicated that they denied authorization for any days of the inpatient stay.

29.     **Patient 2** transferred from San Gabriel Valley Hospital to Keck for a higher level of care for emergency services.  Patient 2 was admitted to the intensive care unit ("ICU") and Plaintiff provided medically-necessary hospital services for treatment of multiple emergency medical conditions, including but not limited to dissection of aorta, thoracoabdominal, without mention of rupture (I71.03), and Sepsis unspecified organism (A41.9).

30.     Plaintiff is informed and believes, and on that basis alleges, that at or near the time Patient 2's emergency medical condition stabilized, Plaintiff notified Defendants of Patient 2's admission to Keck and requested authorization of post-stabilization services.

31.     Plaintiff is informed and believes, and on that basis alleges, that Defendants failed to respond to the request for authorization within 30 minutes, and thus Plaintiff's provision of post-stabilization services to Patient 2 was deemed authorized.  Additionally, Plaintiff is informed and believes, and on that basis alleges, that Defendants chose to leave Patient 2 at Keck for all medically necessary post-stabilization services the patient required, rather than assume management of Patient 2's care through transfer to a contracted hospital.

COMPLAINT; DEMAND FOR JURY TRIAL

32.     Plaintiff is informed and believes, and on that basis alleges, that, after the 30 minutes for Defendants' response to the request for authorization already had run, Defendants requested clinical reviews and/or medical records and Plaintiff promptly forwarded them.

33.     Plaintiff is informed and believes, and on that basis alleges that, several days after Plaintiff requested authorization and forwarded clinical reviews and/or medical records, Defendants issued an authorization number indicating Defendants agreed services Plaintiff provided to Patient 2 were medically necessary and provided at the appropriate level of care, and that Defendants would pay Plaintiff for the hospital services.  Plaintiff is informed and believes, and on that basis alleges that, Defendants never during Patient 2's inpatient stay at Keck communicated that they denied authorization for any days of the inpatient stay.

34.     **Patient 3** transferred from the emergency room at USC Verdugo Hills Hospital to Keck for a higher level of care for emergency services.  Patient 3 initially was held in observation and then was admitted to the intensive care unit ("ICU") and Plaintiff provided medically-necessary hospital services for treatment of multiple emergency medical conditions, including but not limited to Malignant neoplasm, Overlapping lesion of oropharynx (C10.8) and coughing up blood (Hemoptysis) (R04. 2).

35.     Plaintiff is informed and believes, and on that basis alleges, the following: Prior to or near the time Patient 3's emergency medical condition stabilized, Plaintiff notified Defendants of Patient 3's admission to Keck and requested authorization of post-stabilization services.   No one answered the phone when Plaintiff called Defendants to request authorization and thus, Plaintiff left a voicemail message.

36.     Plaintiff is informed and believes, and on that basis alleges, that Defendants failed to respond to the request for authorization within 30 minutes, and thus Plaintiff's provision of post-stabilization services to Patient 3 was deemed authorized.  Additionally, Plaintiff is informed and believes, and on that basis alleges,

COMPLAINT; DEMAND FOR JURY TRIAL

that Defendants chose to leave Patient 3 at Keck for all medically necessary post-stabilization services the patient required, rather than assume management of Patient 3's care through transfer to a contracted hospital.

37.     Plaintiff is informed and believes, and on that basis alleges, that, after the 30 minutes for Defendants' response to the request for authorization already had run, Defendants requested clinical reviews and/or medical records and Plaintiff promptly forwarded them.

38.     Plaintiff is informed and believes, and on that basis alleges that, several days after Plaintiff requested authorization and forwarded clinical reviews and/or medical records, Defendants issued an authorization number indicating Defendants agreed services Plaintiff provided to Patient 3 were medically necessary and provided at the appropriate level of care, and that Defendants would pay Plaintiff for the hospital services.  Plaintiff is informed and believes, and on that basis alleges that, Defendants never during Patient 3's inpatient stay at Keck communicated that they denied authorization for any days of the inpatient stay.

39.     Weeks after Patient 3 discharged home, Defendants issued an authorization for all days of the inpatient stay.

40.     **Patient 4** transferred from the emergency room at Beverly Hospital to Keck for a higher level of care for emergency services.  Patient 4 was admitted to the coronary care unit ("CCU") and Plaintiff provided medically-necessary hospital services for treatment of multiple emergency medical conditions, including but not limited to a stroke, specifically a cerebral infarction due to occlusion or stenosis of small artery (I63. 81) and Occlusion and stenosis of left middle cerebral artery (I66. 02).

41.     Plaintiff is informed and believes, and on that basis alleges, that at or near the time Patient 4's emergency medical condition stabilized, Plaintiff notified Defendants of Patient 4's admission to Keck and requested authorization of post-stabilization services.

COMPLAINT; DEMAND FOR JURY TRIAL

42.     Plaintiff is informed and believes, and on that basis alleges, that Defendants failed to respond to the request for authorization within 30 minutes, and thus Plaintiff's provision of post-stabilization services to Patient 4 was deemed authorized.  Additionally, Plaintiff is informed and believes, and on that basis alleges, that Defendants chose to leave Patient 4 at Keck for all medically necessary post-stabilization services the patient required, rather than assume management of Patient 4's care through transfer to a contracted hospital.

43.     Plaintiff is informed and believes, and on that basis alleges, that, after the 30 minutes for Defendants' response to the request for authorization already had run, Defendants requested clinical reviews and/or medical records and Plaintiff promptly forwarded them.

44.     Plaintiff is informed and believes, and on that basis alleges that, several days after Plaintiff requested authorization and forwarded clinical reviews and/or medical records, Defendants issued an authorization number indicating Defendants agreed services Plaintiff provided to Patient 4 were medically necessary and provided at the appropriate level of care, and that Defendants would pay Plaintiff for the hospital services.  Plaintiff is informed and believes, and on that basis alleges that, Defendants never during Patient 4's inpatient stay at Keck communicated that they denied authorization for any days of the inpatient stay.

45.     More than a week after Patient 4 discharged from Keck, Defendants issued a written authorization for all inpatient days of Patient 4's stay at Keck.

46.     **Patient 5** transferred from USC Arcadia Hospital to Keck for a higher level of care not available at the sending facility.

47.     Plaintiff is informed and believes, and on that basis alleges, that Defendants pre-authorized, approved and assisted in arranging Patient 5's transfer and admission to Keck.

48.     Patient 5 was admitted to Keck and then ultimately to the intensive care unit ("ICU") and Plaintiff provided medically-necessary hospital services for treatment

COMPLAINT; DEMAND FOR JURY TRIAL

of multiple medical conditions, including but not limited to Cardiomyopathy (I42.9), Non-ST-Elevation Myocardial Infarction (NSTEMI) (I21.4) and Cerebral infarction due to unspecified occlusion or stenosis of right middle cerebral artery (I63.511).

49.    Plaintiff is informed and believes, and on that basis alleges, that Plaintiff notified Defendants of Patient 5's admission to Keck and made multiple telephone calls to Defendants to request authorization of continued days of the Patient's stay, to which Defendants did not respond.

50.    Plaintiff is informed and believes, and on that basis alleges, that Defendants failed to respond to the request for authorization within 30 minutes. Additionally, Plaintiff is informed and believes, and on that basis alleges, that Defendants chose to leave Patient 5 at Keck for all medically necessary post-stabilization services the patient required, rather than assume management of Patient 5's care through transfer to a contracted hospital.

51.    Plaintiff is informed and believes, and on that basis alleges, that, after the 30 minutes ran from each of Plaintiff's requests for authorization, Defendants requested clinical reviews and/or medical records and Plaintiff promptly forwarded them.

52.    Plaintiff is informed and believes, and on that basis alleges that, Defendants never during Patient 5's inpatient stay at Keck communicated that they denied authorization for any days of the inpatient stay.

53.    **Patient 6** presented to Keck for elective (meaning non-emergent/schedule) inpatient services, specifically surgery for placement of skin graft for treatment of open wound of the right forearm. Defendants pre-authorized Plaintiff's provision of these services to Patient 6, indicating Defendants agreed Plaintiff's hospital services to Patient 6 were medically necessary, and that Defendants would pay Plaintiff for the hospital services.  Plaintiff admitted Patient 6 and provided the medically necessary services at Keck in reliance on Defendants' pre-authorizations.

54.     Plaintiff is informed and believes, and on that basis alleges that, Defendants authorized all days of Patient 6's inpatient stay at Keck.

55.     **Patient 7** presented to Keck for elective outpatient services, including Core needle biopsy lung or mediastinum percutaneous, including image guidance, when performed (CPT 32408). Defendants pre-authorized Plaintiff's provision of services to Patient 7, indicating Defendants agreed Plaintiff's hospital services to Patient 7 were medically necessary, and that Defendants would pay Plaintiff for the hospital services.  Plaintiff provided the medically necessary services to Patient 7 in reliance on Defendants' pre-authorizations.

56.     **Patient 8** presented to Keck for elective outpatient services, including cystourethroscopy, with injection(s) for chemodenervation of the bladder (CPT 52287). Defendants pre-authorized Plaintiff's provision of services to Patient 8, indicating Defendants agreed Plaintiff's hospital services to Patient 8 were medically necessary, and that Defendants would pay Plaintiff for the hospital services.  Plaintiff provided the medically necessary services to Patient 8 in reliance on Defendants' pre-authorizations.

57.     **Patient 9** presented to Keck for elective outpatient services, including nasal endoscopy. Defendants pre-authorized Plaintiff's provision of services to Patient 9, indicating Defendants agreed Plaintiff's hospital services to Patient 9 were medically necessary, and that Defendants would pay Plaintiff for the hospital services. Plaintiff provided the medically necessary services to Patient 9 at Keck in reliance on Defendants' pre-authorizations.

58.     **Patient 10** presented to Norris for elective outpatient services, including surgical excision. Defendants pre-authorized Plaintiff's provision of services to Patient 10, indicating Defendants agreed Plaintiff's hospital services to Patient 10 were medically necessary, and that Defendants would pay Plaintiff for the hospital services. Plaintiff provided the medically necessary services to Patient 10 at Norris in reliance on Defendants' pre-authorizations.

59.     **Patient 11** presented to Norris for elective outpatient services, including surgery for the removal and replacement of a prosthesis. Defendants pre-authorized Plaintiff's provision of services to Patient 11, indicating Defendants agreed Plaintiff's hospital services to Patient 11 were medically necessary, and that Defendants would pay Plaintiff for the hospital services.  Plaintiff provided the medically necessary services to Patient 11 at Norris in reliance on Defendants' pre-authorizations.

60.     **Patient 12** presented to Norris for elective outpatient services, including diagnostic bone marrow; biopsy(ies) and aspiration(s)) (CPT 38222)  with cytogenetics (e.g., CPT 88291). Defendants pre-authorized Plaintiff's provision of services to Patient 12, indicating Defendants agreed Plaintiff's hospital services to Patient 12 were medically necessary, and that Defendants would pay Plaintiff for the hospital services. Plaintiff provided the medically necessary services to Patient 12 at Norris in reliance on Defendants' pre-authorizations.

61.     **Patient 13** presented to Norris for elective outpatient services, including cystometrogram (CPT 51728). Defendants pre-authorized Plaintiff's provision of services to Patient 13, indicating Defendants agreed Plaintiff's hospital services to Patient 13 were medically necessary, and that Defendants would pay Plaintiff for the hospital services.  Plaintiff provided the medically necessary services to Patient 13 at Norris in reliance on Defendants' pre-authorizations.

62.     Plaintiff timely submitted claims for reimbursement to Defendants for the hospital services Plaintiff provided to **Patients 1 through 13**.

63.     However, Defendants allowed reimbursement, including Defendants' payments and identified patient responsibility amounts, on Plaintiff's claims for reimbursement for the hospital services provided to **Patients 1 through 13** that is less than reasonable value.

64.     Plaintiff is informed and believes that Defendants allowed payment, including Defendants' payments and identified patient responsibility amounts, on

COMPLAINT; DEMAND FOR JURY TRIAL

Plaintiff's claims for **Patients 3, 7 through 10, 12 and 13** at 100% of the Medicare rate, which is less than reasonable value.

65. Plaintiff is informed and believes that Defendants intended to allow reimbursement for the services Plaintiff provided to **Patient 2** at 100% of the Medicare rate for DRG 0286, which is less than reasonable value. However, Defendants did not even pay that, and instead allowed payment, including Defendants' payments and identified patient responsibility amounts, on Plaintiff's claim for reimbursement for the hospital services provided to Patient 2 at less than the Medicare rate.

66. Plaintiff is informed and believes that Defendants allowed payment, including Defendants' payments and identified patient responsibility amounts, on Plaintiff's claim for reimbursement for the hospital services provided to **Patients 1, and 4 through 6** at less than the Medicare rate.

## <u>FIRST CAUSE OF ACTION</u>

### BREACH OF IMPLIED-IN-LAW CONTRACT

### (Emergency Services)

### (AS TO ALL DEFENDANTS)

67. Plaintiff re-alleges and incorporates herein by reference each and every allegation set forth above.

68. Plaintiff is informed and believes that, during all times addressed in this complaint, Defendants are responsible for payment of emergency services provided to Patients 1 through 5 ("Emergency Patients") under a commercial plan licensed as a health care service plan under the Knox-Keene Act.

69. Defendant LA Care and Does 1 through 8 are health care service plans licensed by the California Department of Managed Health Care.

70. Pursuant to Civil Code California Civil Code section 1611, "<u>when a contract does not determine the amount of the consideration, nor the method by which it is to be ascertained, or when it leaves the amount thereof to the discretion of an</u>

COMPLAINT; DEMAND FOR JURY TRIAL

interested party, the consideration must be so much money as the object of the contract is reasonably worth." (Emphasis added.)

71.     Plaintiff is informed and believes that it provided emergency services to Patients 1 through 5, and submitted complete claims for reimbursement to Defendants for such services.

72.     Based on applicable law and the totality of the circumstances set forth above, Defendants have impliedly requested that Plaintiff perform the services, resulting in implied-in-law contracts by which Defendants are obligated to pay Plaintiff the reasonable charges for such services.

73.     Defendants paid less than the reasonable charges for the services the Plaintiff provided to Patients 1 through 5.

74.     On information and belief, Defendants paid Plaintiff 100% of the Medicare rate for some of the claims for reimbursement for the emergency services provided to Patients 1 through 5, including specifically the claim for Patient 3.  The Medicare rate Defendants paid is substantially less than the reasonable charges for such services.

75.     Indeed, the Department of Managed Health Care has stated,

> "the reimbursement of non-contracted providers based solely on Medicare and MediCal payment rates would be inconsistent with California law.  Non-contracted providers are entitled to compensation equivalent to the reasonable value of the services rendered.  Both Medicare and MediCal-fee schedules are designed to pay less than the prevailing value of health care services."

A true and correct copy of Department of Managed Health Care's ("DMHC") Response to Comment 10 to "Claims Settlement Practices and Dispute Resolution Mechanisms" Regulations, 3rd Comment Period Ending April 30, 2003, is enclosed hereto as Exhibit "A" and incorporated herein as reference.

76.     On information and belief, Defendants paid Plaintiff less than 100% of the Medicare rate for many of the claims for reimbursement for the emergency services provided to Patients 1 through 5, including specifically the claims for Patients 1, 2, 4, and 5.

COMPLAINT; DEMAND FOR JURY TRIAL

77. Defendants damaged Plaintiff in an amount to be proved at trial, equal to $1,813,988.47.

## SECOND CAUSE OF ACTION

### BREACH OF IMPLIED-IN-LAW CONTRACT

### (Post-Stabilization Services)

### (AS TO ALL DEFENDANTS)

78. Plaintiff re-alleges and incorporates herein by reference each and every allegation set forth above in Paragraphs 1 through 66.

79. Plaintiff is informed and believes that, during all times addressed in this complaint, Defendants are responsible for payment of post-stabilization services provided to Patients 1 through 5 ("Post-Stabilization Patients"), respectively, under a commercial plan licensed as a health care service plan under the Knox-Keene Act, and that Defendants required prior authorization for post-stabilization care for the Post-Stabilization Patients.

80. During all times addressed in this complaint, Plaintiff did not have a written contract with Defendants applicable to the post-stabilization care services provided to the Post-Stabilization Patients.

81. Plaintiff is informed and believes that, near the time the emergency medical condition of each of the Post-Stabilization Patients was stabilized and before Plaintiff provided post-stabilization services, Plaintiff contacted Defendants to request authorization of the provision of post-stabilization services to the Post-Stabilization Patients at Keck.

82. Plaintiff contacted Defendants directly and/or through Defendants' contracting medical providers ("UM Designees"). Plaintiff is informed and believes that, at all times discussed herein, Defendants had written contracts with the UM Designees through which Defendants delegated authority for utilization management, including reviewing and timely responding to requests for authorization of post-stabilization care, authorizing or deeming authorized post-stabilization care at

COMPLAINT; DEMAND FOR JURY TRIAL

noncontracted hospitals, and arranging for transfer of stable patients from noncontracted hospitals to contracted hospitals, and thus the UM Designees are the actual agents of Defendants that perform these functions with Defendants' knowledge and consent.

83. Plaintiff also is informed and believes that Defendants communicated to Plaintiff in telephone calls and written materials, including member identification cards, provider manuals and/or web site, to contact the UM Designees to request and obtain authorization of post-stabilization care, and thus caused the Plaintiff to believe that the UM Designees are the ostensible agents of Defendants that perform these functions with Defendants' knowledge and consent.

84. Plaintiff further is informed and believes that Defendants ratified the decisions of the UM Designees by issuing payments based on the authorizations and/or deemed authorizations issued by the UM Designees.

85. Plaintiff is informed and believes that Defendants, through their designated UM Designees, authorized Plaintiff to provide post-stabilization hospital services to Patients 1 through 5 at Keck and/or failed to respond to request for authorization within 30 minutes, and thus had the opportunity to transfer the Patients to another hospital with a written contract with Defendants, but Defendants did not do so.

86. Plaintiff is informed and believes that it thus provided post-stabilization services to the Post-Stabilization Patients pursuant to authorizations and deemed authorizations from Defendants.

87. Based on applicable law and the totality of the circumstances set forth herein, Defendants have expressly and/or impliedly requested that Plaintiff provide the post-stabilization services provided to the Post-Stabilization Patients, resulting in implied-in-law contracts by which Defendants are obligated to pay Plaintiff the reasonable charges for such services.

88. Pursuant to Civil Code California Civil Code section 1611, "when a contract does not determine the amount of the consideration, nor the method by which it is to be ascertained, or when it leaves the amount thereof to the discretion of an

interested party, the consideration must be so much money as the object of the contract is reasonably worth." (Emphasis added.)

89.    Plaintiff submitted complete bills to Defendants for the services provided to the Post-Stabilization Patients.

90.    Defendants paid Plaintiff less than reasonable value for the services provided to Patients 1 through 5.

91.    On information and belief, Defendants paid Plaintiff 100% of the Medicare allowable rate for some of the claims for reimbursement for the services provided to Patients 1 through 5, including specifically the claim for Patient 3.  The Medicare Allowable rate Defendants paid is less than the reasonable charges for such services.

92.    Indeed, the Department of Managed Health Care has stated,

> "the reimbursement of non-contracted providers based solely on Medicare and MediCal payment rates would be inconsistent with California law.  Non-contracted providers are entitled to compensation equivalent to the reasonable value of the services rendered.  Both Medicare and MediCal-fee schedules are designed to pay less than the prevailing value of health care services."

A true and correct copy of Department of Managed Health Care's ("DMHC") Response to Comment 10 to "Claims Settlement Practices and Dispute Resolution Mechanisms" Regulations, 3rd Comment Period Ending April 30, 2003, is enclosed hereto as Exhibit "A" and incorporated herein as reference.

93.    On information and belief, Defendants paid Plaintiff less than 100% of the Medicare rate for many of the claims for reimbursement for the post-stabilization services provided to Patients 1 through 5, including specifically the claims for Patients 1, 2, 4, and 5.

94.    Defendants damaged Plaintiff in an amount to be proved at trial, no more than $1,813,988.47.

///

///

///

**THIRD CAUSE OF ACTION**

**BREACH OF IMPLIED-IN-FACT CONTRACT**

**(Post-Stabilization Services)**

**(AS TO ALL DEFENDANTS)**

95.  Plaintiff re-alleges and incorporates herein by reference each and every allegation set forth above in Paragraphs 1 through 94.

96.  Plaintiff is informed and believes that, during all times addressed in this complaint, Defendants are responsible for payment of post-stabilization services provided to Patients 1 through 5 ("Post-Stabilization Patients"), respectively, under a commercial plan licensed as a health care service plan under the Knox-Keene Act, and that Defendants required prior authorization for post-stabilization care for the Post-Stabilization Patients.

97.  During all times addressed in this complaint, Plaintiff did not have a written contract with Defendants for the post-stabilization care services provided to the Post-Stabilization Patients.

98.  Plaintiff is informed and believes that, near the time the emergency medical condition of each of the Post-Stabilization Patients was stabilized and before Plaintiff provided post-stabilization services, Plaintiff contacted Defendants to request authorization of Plaintiff's provision of post-stabilization services to the Post-Stabilization Patients at Keck.

99.  Plaintiff contacted Defendants directly and/or through Defendants' contracting medical providers ("UM Designees").  Plaintiff is informed and believe that, at all times discussed herein, Defendants had written contracts with the UM Designees through which Defendants delegated authority for utilization management, including reviewing and timely responding to requests for authorization of post-stabilization care, authorizing or deeming authorized post-stabilization care at noncontracted hospitals, and arranging for transfer of stable patients from noncontracted

COMPLAINT; DEMAND FOR JURY TRIAL

hospitals to contracted hospitals, and thus the UM Designees are the actual agents of Defendants that perform these functions with Defendants' knowledge and consent.

100.   Plaintiff also is informed and believes that Defendants communicated to Plaintiff in telephone calls and written materials, including member identification cards, provider manuals and/or web site, to contact the UM Designees to request and obtain authorization of post-stabilization care, and thus caused the Hospitals to believe that the UM Designees are the ostensible agents of Defendants that perform these functions with Defendants' knowledge and consent.

101.   Plaintiff further is informed and believes that Defendants ratified the decisions of the UM Designees by issuing payments based on the authorizations and/or deemed authorizations issued by the UM Designees.

102.   Plaintiff is informed and believes that Defendants, through their designated UM Designees, authorized Plaintiff to provide post-stabilization services to Patients 1 through 5 at Keck and/or failed to respond to request for authorization within 30 minutes, and thus had the opportunity to transfer the Patients to another hospital with a written contract with Defendants, but Defendants did not do so.

103.   Plaintiff is informed and believes that it thus provided post-stabilization services to the Post-Stabilization Patients pursuant to authorizations and deemed authorizations from Defendants.

104.   By words and conduct, Plaintiff and Defendants formed an implied-in-fact contract for the Plaintiff to provide post-stabilization services to the Post-Stabilization Patients at Keck, and in return Defendants agreed to pay Plaintiff for such services.

105.   Pursuant to Civil Code California Civil Code section 1611, "when a contract does not determine the amount of the consideration, nor the method by which it is to be ascertained, or when it leaves the amount thereof to the discretion of an interested party, the consideration must be so much money as the object of the contract is reasonably worth." (Emphasis added.)

106.   Plaintiff submitted complete bills to Defendants for the post-stabilization services provided to the Post-Stabilization Patients.

107.   Defendants paid Plaintiff less than reasonable value for the services provided to Patients 1 through 5.

108.   On information and belief, Defendants Plaintiff Keck 100% of the Medicare allowable rate for some of the claims for reimbursement for the services provided to Patients 1 through 5, including specifically the claim for Patient 3.   The Medicare Allowable rate Defendants paid is less than the reasonable charges for such services.

109.   Indeed, the Department of Managed Health Care has stated,

> "the reimbursement of non-contracted providers based solely on Medicare and MediCal payment rates would be inconsistent with California law.  Non-contracted providers are entitled to compensation equivalent to the reasonable value of the services rendered.  Both Medicare and MediCal-fee schedules are designed to pay less than the prevailing value of health care services."

A true and correct copy of Department of Managed Health Care's ("DMHC") Response to Comment 10 to "Claims Settlement Practices and Dispute Resolution Mechanisms" Regulations, 3rd Comment Period Ending April 30, 2003, is enclosed hereto as Exhibit "A" and incorporated herein as reference.

110.   On information and belief, Defendants paid Plaintiff less than 100% of the Medicare rate for many of the claims for reimbursement for the post-stabilization services provided to Patients 1 through 5, including specifically the claims for Patients 1, 2, 4, and 5.

111.   Defendants thus breached their implied-in-fact agreements with Plaintiff.

112.   Defendants damaged Plaintiff in an amount to be proved at trial, no more than $1,813,988.47.

///

///

///

COMPLAINT; DEMAND FOR JURY TRIAL

1
2
3
4

## **FOURTH CAUSE OF ACTION**
## **BREACH OF IMPLIED-IN-FACT CONTRACT**
### **(Elective Services)**
### **(AS TO ALL DEFENDANTS)**

5
6

113.   Plaintiff re-alleges and incorporates herein by reference each and every allegation set forth above in Paragraphs 1 through 94.

7
8
9
10
11

114.   The Hospitals are informed and believe that, during all times addressed in this complaint, Defendants are responsible for payment of elective hospital services provided to Patients 5 through 13 ("Elective Services Patients"), respectively, pursuant to a prior authorization under a commercial health maintenance organization ("HMO") plan licensed as a health care service plan under the Knox-Keene Act.

12
13
14

115.   The Hospitals are informed and believe that they contacted Defendants to request pre-authorization for the Hospitals' provision of elective hospital services the Elective Services Patients required.

15
16
17
18
19
20
21

116.   The Hospitals contacted Defendants directly and/or through Defendants' contracting medical providers ("UM Designees").  The Hospitals are informed and believe that Defendants have written contracts with the UM Designees through which Defendants delegated authority for utilization management, including reviewing and timely responding to requests for authorization of elective hospital services, and authorizing such services, and thus the UM Designees are the actual agents of Defendants that perform these functions with Defendants' knowledge and consent.

22
23
24
25
26
27

117.   The Hospitals also are informed and believe that Defendants communicated to the Hospitals in telephone calls and written materials, including member identification cards, provider manuals and/or web site, to contact the UM Designees to request and obtain authorization of elective hospital services, and thus caused the Hospitals to believe that the UM Designees are the ostensible agents of Defendants that perform these functions with Defendants' knowledge and consent.

28

COMPLAINT; DEMAND FOR JURY TRIAL

118.   The Hospitals further are informed and believe that Defendants ratified the decisions of the UM Designees by issuing payments based on the authorizations issued by the UM Designees.

119.   Defendants, through their UM Designees, issued oral and/or written authorizations of Plaintiff's provision of services to Patients 5 through 9 at Keck.

120.   Defendants, through their UM Designees, issued oral and/or written authorizations of Plaintiff's provision of services to Patients 10 through 13 at Norris.

121.   The Hospitals reasonably understood the actions and communications by Defendants and their UM Designees to constitute express and/or implied requests that the Hospitals provide services to the Elective Services Patients and an agreement by Defendants to pay the Hospitals for such requested services.

122.   The conduct by the Hospitals, Defendants and their UM Designees gave rise to implied-in-fact agreements between the Hospitals and Defendants obligating Defendants to pay for the care and treatment rendered by the Hospitals to the Elective Services Patients.

123.   The Hospitals performed all their obligations under their implied-in-fact contracts with Defendants in that they cared for and treated the Elective Services Patients to the best of their ability.

124.   The Hospitals and Defendants never reached an agreement as to the rate of payment.

125.   Pursuant to Civil Code California Civil Code section 1611, "<u>when a contract does not determine the amount of the consideration, nor the method by which it is to be ascertained, or when it leaves the amount thereof to the discretion of an interested party</u>, the consideration must be so much money as the object of the contract is reasonably worth." (Emphasis added.)

126.   The Hospitals timely submitted to Defendants claims for reimbursement for the services provided to the Elective Services Patients.

COMPLAINT; DEMAND FOR JURY TRIAL

127.   Defendants acknowledged their contractual obligations to the Hospitals through communications and correspondence, including but not limited to issuing partial payments on such claims.  However, Defendants failed to fully reimburse the Hospitals for the services rendered to the Elective Services Patients at a reasonable rate.

128.   Defendants paid Keck less than reasonable value for the services provided to Patients 5 through 13.

129.   On information and belief, Defendants paid Plaintiff 100% of the Medicare allowable rate for some of the claims for reimbursement for the services provided to Patients 5 through 13, including specifically the claims for Patients 7 through 10, 12 and 13.   The Medicare Allowable rate Defendants paid is less than the reasonable charges for such services.

130.   Indeed, the Department of Managed Health Care has stated,

> "the reimbursement of non-contracted providers based solely on Medicare and MediCal payment rates would be inconsistent with California law.  Non-contracted providers are entitled to compensation equivalent to the reasonable value of the services rendered.  Both Medicare and MediCal-fee schedules are designed to pay less than the prevailing value of health care services."

A true and correct copy of Department of Managed Health Care's ("DMHC") Response to Comment 10 to "Claims Settlement Practices and Dispute Resolution Mechanisms" Regulations, 3rd Comment Period Ending April 30, 2003, is enclosed hereto as Exhibit A and incorporated herein as reference.

131.   On information and belief, Defendants paid Plaintiff less than 100% of the Medicare allowable rate for many of the claims for reimbursement for the services provided to the Elective Services Patients, including Patients 5 and 6. The Medicare rate for these services is substantially less than the reasonable value of such services.

132.   Defendants thus breached their implied-in-fact agreements with the Hospitals.

///

///

COMPLAINT; DEMAND FOR JURY TRIAL

133.   As a result, Defendants damaged Plaintiff in an amount not less than $167,336.16 for the hospital services provided at Keck and $103,119.29 for the hospital services provided at Norris.

## FIFTH CAUSE OF ACTION

## QUANTUM MERUIT

## (AS TO ALL DEFENDANTS)

134.   Plaintiff re-alleges and incorporates herein by reference each and every allegation set forth above in Paragraphs 1 through 94.

135.   The Defendants expressly and/or implied requested that the Plaintiff provide medically necessary and physician ordered hospital services.

136.   Plaintiff provided emergency, post-stabilization, and elective/non-emergency hospital services to 13 members of Defendants' health service plans.

137.   With respect to these emergency services, Plaintiff was required by law to provide emergency care for patients until their emergency medical condition was stabilized without first obtaining insurance verification or authorization from Defendants to provide the treatment. See Cal. Health & Safety Code § 1317; EMTALA, Social Security Act section 1867(a).

138.   California law requires health care service plans and health insurance companies, including Defendants, to reimburse Plaintiff for the reasonable value of the emergency services provided. See Cal. Health & Safety Code §§ 1371.35, 1371.4; Cal. Ins. Code §§ 10123.13, 10123.147.

139.   By virtue of their obligations to their members, statutory or otherwise, Defendants implicitly requested that Plaintiff treat the Patients transferring to Keck for higher level of care, emergency services for treatment of emergency medical conditions. Accordingly, a contract implied in law was created when Plaintiff provided emergency care to the Patients, which Defendants were obligated to reimburse Plaintiff for the emergency care provided.

COMPLAINT; DEMAND FOR JURY TRIAL

140.   Defendants also authorized Plaintiff to provide outpost-stabilization hospital services. Plaintiff provided hospital services to the Patients based on Defendants' express or implied authorization to treat the members, such as cases where Defendants authorized care for services following the stabilization of an emergency condition.

141.   Defendants and their agents expressly and/or impliedly requested that Plaintiff provide post-stabilization hospital services to the Patients by choosing to keep the Patients at Keck rather than arrange for the Patients' transfer to a different hospital for post-stabilization services, and by expressly and/or impliedly authorizing Plaintiff's services for post-stabilization and elective/non-emergent services.    Furthermore, Defendants and their agents expressly and/or impliedly requested that Plaintiff provide services to the Patients by choosing to operate a health care service plan that is obligated to provide or arrange for the provision of medically necessary services to its members in a timely manner, and further is required to cover and pay for emergency care, whether or not the emergency provider is in-network or not, and post-stabilization care even in the absence of a written contract.

142.   Defendants also authorized Plaintiff to provide elective services. Plaintiff provided elective hospital services to the Patients based on Defendants' express or implied authorization to treat the members.

143.   Plaintiff provided medical services to the Patients pursuant to such express and/or implied requests.

144.   Plaintiff's provision of medically necessary care and treatment to the Patients was intended to benefit, and did benefit, Defendants because Plaintiff provided the Patients medical treatment that Defendants were contractually obliged to pay for, arrange and/or provide at their own expense.

145.   The reasonable value of the services Plaintiff provided the Patients at the express and/or implied requests of Defendants is $2,548,038.91.

COMPLAINT; DEMAND FOR JURY TRIAL

146.   As a result of the benefit conferred upon Defendants, Plaintiff is entitled to quantum meruit damages in the amount of $2,038,788.53.

## SIXTH CAUSE OF ACTION

## NEGLIGENCE

## (GOVERNMENT CODE SECTION 815.6 – Emergency Services)

## (AS TO DEFENDANT LA CARE)

147.   Plaintiff re-alleges and incorporates herein by reference each and every allegation set forth above in Paragraphs 1 through 94.

148.   At all times herein mentioned, Defendant LA Care was a public entity and licensed as a health care service plan under the Knox-Keene Act.

149.   Plaintiff is informed and believes that, during all times addressed in this complaint, Defendant LA Care was and is responsible for payment of emergency services provided to Patients 1 through 5 ("Emergency Patients") under a commercial plan licensed as a health care service plan under the Knox-Keene Act.

150.   Health and Safety Code section 1371.4 was intended to protect hospitals, such as Plaintiff's Hospitals, from potential financial injury created by the obligation to provide emergency services without first questioning the patient's ability to pay.

Reasonable and Customary

151.   The Knox-Keene Act and DMHC regulations require that health care service plans, such as LA Care, operating a health maintenance organization reimburse each complete claim, or portion thereof, no later than forty-five working days after the date of receipt of the complete claim.  (Health and Safety Code § 1371; and Title 28 Cal. Code Regs. § 1300.71(g).)   Section 1371 was intended to protect health care providers, such as Plaintiff, from the risk of financial injury caused by health care service plans' failure to timely and accurately pay for services provided to plan members.

152.   The DMHC's regulations defining the term "Reimbursement of a Claim," in the case of noncontracted providers and contracted providers without a written

COMPLAINT; DEMAND FOR JURY TRIAL

contract as "the payment of the reasonable and customary value . . . ," were intended to protect noncontracted providers and providers without a written contract, such as Plaintiff, from the risk of financial injury caused by health care service plans' failure to timely pay the reasonable value of health care services.

153.  Plaintiff is informed and believes that LA Care violated Health and Safety Code section 1371, Rule 1300.71(g) and Rule 1300.71(a)(3) by failing to pay the reasonable and customary value of the Plaintiff's claims for reimbursement of the services provided to the Emergency Patients.

154.  In particular, Plaintiff is informed and believes that LA Care failed to pay the claims at issue based upon statistically credible information that is updated at least annually and takes into consideration: (i) the provider's training qualifications, and length of time in practice; (ii) the nature of the services provided, (iii) the fees usually charged by the provider; (iv) prevailing provider rates charged in the general geographic area in which the services were rendered; (v) other aspects of the economics of the medical provider's practice that are relevant; and (vi) any unusual circumstances in the case.

155.  Plaintiff is informed and believes that it provided emergency services to Patients 1 through 5, and submitted complete claims for reimbursement to LA Care for such services.

156.  LA Care paid Plaintiff less than the reasonable charges for the services the hospital provided to Patients 1 through 5.

157.  On information and belief, LA Care paid Plaintiff 100% of the Medicare rate for many of the claims for reimbursement for the services provided to Patients 1 through 5, including specifically the claim for Patient 3. The Medicare rate LA Care paid is substantially less than the reasonable charges for such services.

158.  Indeed, the Department of Managed Health Care has stated,

"[T]he reimbursement of non-contracted providers based solely on Medicare and MediCal payment rates would be inconsistent with California law.  Non-contracted providers

COMPLAINT; DEMAND FOR JURY TRIAL

are entitled to compensation equivalent to the reasonable value of the services rendered.  Both Medicare and MediCal-fee schedules are designed to pay less than the prevailing value of health care services."

A true and correct copy of Department of Managed Health Care's ("DMHC") Response to Comment 10 to "Claims Settlement Practices and Dispute Resolution Mechanisms" Regulations, 3rd Comment Period Ending April 30, 2003, is enclosed hereto as Exhibit A and incorporated herein as reference.

159.   On information and belief, LA Care paid Plaintiff <u>less</u> than 100% of the Medicare rate for many of the claims for reimbursement for the emergency services provided to Patients 1 through 5, including specifically the claims for Patients 1, 2, 4, and 5.

160.   LA Care failed to perform its mandatory duties and such failures were the proximate cause of Plaintiff's damages.

161.   LA Care damaged Plaintiff in an amount to be proved at trial, equal to $1,813,988.47.

<u>**SEVENTH CAUSE OF ACTION**</u>

**NEGLIGENCE**

**(GOVERNMENT CODE SECTION 815.6 – Post-Stabilization Services)**

**(AS TO DEFENDANT LA CARE)**

162.   Plaintiff re-alleges and incorporates herein by reference each and every allegation set forth above in Paragraphs 1 through 94.

163.   At all times herein mentioned, Defendant LA Care was a public entity and licensed as a health care service plan under the Knox-Keene Act.

164.   The Hospitals are informed and believe that, during all times addressed in this complaint, LA Care was and is responsible for payment of post-stabilization services provided to Patients 1 through 5 ("Post-Stabilization Patients"), respectively, under a commercial plan licensed as a health care service plan under the Knox-Keene Act, and that LA Care required prior authorization for post-stabilization care for the Post-Stabilization Patients.

165.   During all times addressed in this complaint, Plaintiff did not have a written contract with LA Care for the post-stabilization care services provided to the Post-Stabilization Patients.

166.   Health and Safety Code section 1262.8 was intended to ensure that hospitals that are noncontracted or without a written contract receive reasonable reimbursement for post-stabilization services provided to members of health care service plans, such as LA Care.

167.   Plaintiff is informed and believes that, near the time the emergency medical condition of each of the Post-Stabilization Patients was stabilized and before Plaintiff provided post-stabilization services, Plaintiff contacted LA Care to request authorization of post-stabilization services.   Plaintiff either provided LA Care the treating physician's diagnosis and other relevant information reasonably necessary for LA Care to decide whether to authorize post-stabilization care or to assume management of the Post-Stabilization Patients' care by prompt transfer, or LA Care did not request such information.

168.   Plaintiff contacted LA Care directly and/or through LA Care's contracting medical providers ("UM Designees").   Plaintiff is informed and believes that LA Care has written contracts with the UM Designees through which LA Care delegated authority for utilization management, including reviewing and timely responding to requests for authorization of post-stabilization care, authorizing or deeming authorized post-stabilization care at noncontracted hospitals, and arranging for transfer of stable patients from noncontracted hospitals to contracted hospitals, and thus the UM Designees are the actual agents of LA Care that perform these functions with LA Care's knowledge and consent.

169.   Plaintiff also is informed and believes that LA Care communicated to Plaintiff in telephone calls and written materials, including member identification cards, provider manuals and/or web site, to contact the UM Designees to request and obtain authorization of post-stabilization care, and thus caused the Plaintiff to believe that the

COMPLAINT; DEMAND FOR JURY TRIAL

UM Designees are the ostensible agents of LA Care that perform these functions with LA Care's knowledge and consent.

170.  Plaintiff further is informed and believes that LA Care ratified the decisions of the UM Designees by issuing payments based on the authorizations and/or deemed authorizations issued by the UM Designees.

171.  Plaintiff is informed and believes that LA Care, through its designated UM Designees, authorized Plaintiff to provide post-stabilization services to Patients 1 through 5 at Keck and/or failed to respond to request for authorization within 30 minutes, and thus, LA Care had the opportunity to transfer the Patients to another hospital with a written contract with LA Care, but LA Care did not do so.

172.  Plaintiff is informed and believes that it thus provided post-stabilization services to the Post-Stabilization Patients pursuant to authorizations and deemed authorizations from LA Care.

173.  The Knox-Keene Act and DMHC regulations require that health care service plans, such as LA Care, operating a health maintenance organization reimburse each complete claim, or portion thereof, no later than forty-five working days after the date of receipt of the complete claim.  (Health and Safety Code § 1371; and Title 28 Cal. Code Regs. § 1300.71(g).)  Section 1371 was intended to protect health care providers, such as Plaintiff, from the risk of financial injury caused by health care service plans' failure to timely and accurately pay for services provided to plan members.

174.  The DMHC's regulations defining the term "Reimbursement of a Claim," in the case of noncontracted providers and contracted providers without a written contract as "the payment of the reasonable and customary value . . . ," were intended to protect noncontracted providers and providers without a written contract, such as Plaintiff, from the risk of financial injury caused by health care service plans' failure to timely pay the reasonable value of health care services.

COMPLAINT; DEMAND FOR JURY TRIAL

175.   Plaintiff is informed and believes that LA Care violated Health and Safety Code section 1371, Rule 1300.71(g) and Rule 1300.71(a)(3) by failing to pay the reasonable and customary value of the Plaintiff's claims for reimbursement of the post-stabilization services provided to Patients 1 through 5.

176.   In particular, Plaintiff is informed and believes that LA Care failed to pay the claims at issue based upon statistically credible information that is updated at least annually and takes into consideration: (i) the provider's training qualifications, and length of time in practice; (ii) the nature of the services provided, (iii) the fees usually charged by the provider; (iv) prevailing provider rates charged in the general geographic area in which the services were rendered; (v) other aspects of the economics of the medical provider's practice that are relevant; and (vi) any unusual circumstances in the case.

177.   LA Care paid Plaintiff less than reasonable value for the services provided to Patients 1 through 5.

178.   On information and belief, LA Care paid Plaintiff 100% of the Medicare rate for many of the claims for reimbursement for the services provided to Patients 1 through 5, including specifically the claim for Patient 3.  The Medicare rate LA Care paid is substantially less than the reasonable charges for such services.

179.   Indeed, the Department of Managed Health Care has stated,

> "the reimbursement of non-contracted providers based solely on Medicare and MediCal payment rates would be inconsistent with California law.  Non-contracted providers are entitled to compensation equivalent to the reasonable value of the services rendered.  Both Medicare and MediCal-fee schedules are designed to pay less than the prevailing value of health care services."

A true and correct copy of Department of Managed Health Care's ("DMHC") Response to Comment 10 to "Claims Settlement Practices and Dispute Resolution Mechanisms" Regulations, 3rd Comment Period Ending April 30, 2003, is enclosed hereto as Exhibit A and incorporated herein as reference.

180.   On information and belief, LA Care paid Keck <u>less</u> than 100% of the Medicare rate for many of the claims for reimbursement for the post-stabilization services provided to Patients 1 through 5, including specifically the claims for Patients 1, 2, 4, and 5.

181.   LA Care failed to perform its mandatory duties and such failures were the proximate cause of Plaintiff's damages.

182.   LA Care damaged Plaintiff in an amount to be proved at trial,  equal to $1,813,988.47.

### EIGHTH CAUSE OF ACTION

### NEGLIGENCE

### (GOVERNMENT CODE SECTION 815.6 – Elective Services)

### (AS TO DEFENDANT LA CARE)

183.   Plaintiff re-alleges and incorporates herein by reference each and every allegation set forth above in Paragraphs 1 through 94.

184.   Defendants are informed and believe that, during all times addressed in this complaint, LA Care was and is responsible for payment of elective hospital services provided to Patients 5 through 13 ("Elective Services Patients"), respectively, pursuant to a prior authorization under a commercial health maintenance organization ("HMO") plan licensed as a health care service plan under the Knox-Keene Act.

185.   Plaintiff is informed and believes that it contacted LA Care to request pre-authorization of the elective hospital services to be provided to Patients 6 through 13 at Keck and Norris, respectively.

186.   The Hospitals contacted LA Care directly and/or through LA Care's contracting medical providers ("UM Designees").   The Hospitals are informed and believe that LA Care has written contracts with the UM Designees through which LA Care delegated authority for utilization management, including reviewing and timely responding to requests for authorization of elective hospital services, and authorizing

COMPLAINT; DEMAND FOR JURY TRIAL

such services, and thus the UM Designees are the actual agents of LA Care that perform these functions with LA Care's knowledge and consent.

187.   The Hospitals also are informed and believe that LA Care communicated to the Hospitals in telephone calls and written materials, including member identification cards, provider manuals and/or web site, to contact the UM Designees to request and obtain authorization of elective hospital services, and thus caused the Hospitals to believe that the UM Designees are the ostensible agents of LA Care that perform these functions with LA Care's knowledge and consent.

188.   The Hospitals further are informed and believe that LA Care ratified the decisions of the UM Designees by issuing payments based on the authorizations issued by the UM Designees.

189.   LA Care, through its UM Designees, issued written authorizations of Plaintiff's provision of hospital services to Patients 5 through 9 at Keck.   Plaintiff provided hospital services to Patients 5 through 9 pursuant to such authorizations.

190.   LA Care, through its UM Designees, issued written authorizations of Plaintiff's provision of hospital services to Patients 10 through 13 at Norris.   Plaintiff provided hospital services to Patients 10 through 13 pursuant to such authorizations.

191.   The Hospitals timely submitted to LA Care claims for reimbursement for the services provided to the Elective Services Patients.

192.   The Knox-Keene Act and DMHC regulations require that health care service plans, such as LA Care, operating a health maintenance organization reimburse each complete claim, or portion thereof, no later than forty-five working days after the date of receipt of the complete claim.   (Health and Safety Code § 1371; and Title 28 Cal. Code Regs. § 1300.71(g).)   Section 1371 was intended to protect health care providers, such as Plaintiff, from the risk of financial injury caused by health care service plans' failure to timely and accurately pay for services provided to plan members.

193.   The DMHC's regulations defining the term "Reimbursement of a Claim," in the case of noncontracted providers and contracted providers without a written contract as "the payment of the reasonable and customary value . . . ," were intended to protect noncontracted providers and providers without a written contract, such as Plaintiff, from the risk of financial injury caused by health care service plans' failure to timely pay the reasonable value of health care services.

194.   The Hospitals are informed and believe that LA Care violated Health and Safety Code section 1371, Rule 1300.71(g) and Rule 1300.71(a)(3) by failing to pay the reasonable and customary value of the Hospitals' claims for reimbursement of the hospital services provided to the Elective Services Patients.

195.   In particular, the Hospitals are informed and believe that LA Care failed to pay the claims at issue based upon statistically credible information that is updated at least annually and takes into consideration: (i) the provider's training qualifications, and length of time in practice; (ii) the nature of the services provided, (iii) the fees usually charged by the provider; (iv) prevailing provider rates charged in the general geographic area in which the services were rendered; (v) other aspects of the economics of the medical provider's practice that are relevant; and (vi) any unusual circumstances in the case.

196.   Defendants paid Keck less than reasonable value for the services provided to Patients 5 through 13.

197.   On information and belief, Defendants paid Plaintiff 100% of the Medicare allowable rate for some of the claims for reimbursement for the services provided to Patients 5 through 13, including specifically the claims for Patients 7 through 10, 12 and 13.   The Medicare Allowable rate Defendants paid is less than the reasonable charges for such services.

198.   Indeed, the Department of Managed Health Care has stated,

"the reimbursement of non-contracted providers based solely on Medicare and MediCal payment rates would be inconsistent with California law.   Non-contracted providers

COMPLAINT; DEMAND FOR JURY TRIAL

are entitled to compensation equivalent to the reasonable value of the services rendered. Both Medicare and MediCal-fee schedules are designed to pay less than the prevailing value of health care services."

A true and correct copy of Department of Managed Health Care's ("DMHC") Response to Comment 10 to "Claims Settlement Practices and Dispute Resolution Mechanisms" Regulations, 3rd Comment Period Ending April 30, 2003, is enclosed hereto as Exhibit A and incorporated herein as reference.

199.   On information and belief, Defendants paid Plaintiff less than 100% of the Medicare allowable rate for many of the claims for reimbursement for the services provided to the Elective Services Patients, including Patients 5 and 6. The Medicare rate for these services is substantially less than the reasonable value of such services.

200.   LA Care failed to perform its mandatory duties and such failures were the proximate cause of the Hospitals' damages.

201.   As a result, Defendants damaged Plaintiff in an amount not less than $167,336.16 for the hospital services provided at Keck and $103,119.29 for the hospital services provided at Norris.

## NINTH CAUSE OF ACTION

## VIOLATION OF 42 U.S.C. § 1983

## (AS TO ALL DEFENDANTS)

202.   Plaintiff re-alleges and incorporates herein by reference each and every allegation set forth above in Paragraphs 1 through 94.

203.   To the extent Defendants are immune from state law causes of action by Plaintiff to recover the reasonable value of the hospital services Plaintiff provided to each of the Patients 1 through 5, Plaintiff asserts a cause of action for damages, and declaratory and injunctive relief, based on the deprivation of rights under Title 42 of the United States Code section 1983.

204.   Defendant LA Care is a public entity authorized by California Welfare and Institutions Code section 14087.38 to enter into contracts for the provision of health care services to individuals, including those employed by public agencies or private

COMPLAINT; DEMAND FOR JURY TRIAL

businesses and uninsured or indigent individuals.  LA Care is required under California Welfare and Institutions Code section 14087.38(s)(1) to obtain licensure as a health care service plan under the Knox-Keene Health Care Service Plan Act of 1975 (Chapter 2.2 (commencing with Section 1340) of Division 3 of the Health and Safety Code).

205.   Defendant LA Care further was established by ordinance by the Board of Supervisors of the County of Los Angeles.

Emergency Services

206.   Health and Safety Code section 1371.4 gives Plaintiff a right to reasonable reimbursement for emergency services.

207.   Plaintiff is informed and believes that it provided emergency services to Patients 1 through 5, and submitted complete claims for reimbursement to Defendants for such services.

208.   Defendants paid Plaintiff less than the reasonable value for the services provided to Patients 1 through 5 at Keck.

209.   Plaintiff is informed and believes that Defendants paid Plaintiff 100% of the Medicare rate for many of the claims for reimbursement for the services provided to Patients 1 through 5, including specifically the claim for Patient 3.  The Medicare rate Defendants paid is substantially less than the reasonable charges for such services.

210.   Indeed, the Department of Managed Health Care has stated,

> "the reimbursement of non-contracted providers based solely on Medicare and MediCal payment rates would be inconsistent with California law.  Non-contracted providers are entitled to compensation equivalent to the reasonable value of the services rendered.  Both Medicare and MediCal-fee schedules are designed to pay less than the prevailing value of health care services."

A true and correct copy of Department of Managed Health Care's ("DMHC") Response to Comment 10 to "Claims Settlement Practices and Dispute Resolution Mechanisms" Regulations, 3rd Comment Period Ending April 30, 2003, is enclosed hereto as Exhibit A and incorporated herein as reference.

COMPLAINT; DEMAND FOR JURY TRIAL

211.   On information and belief, Defendants paid Plaintiff <u>less</u> than 100% of the Medicare rate for many of the claims for reimbursement for the emergency services provided to Patients 1 through 5, including specifically the claims for Patients 1, 2, 4, and 5.

212.   Defendants damaged Plaintiff in an amount to be proved at trial, equal to $1,813,988.47.

Post Stabilization Services

213.   Health and Safety Code section 1262.8 gives Plaintiff a right to reasonable reimbursement for post-stabilization services that are authorized or deemed authorized.

214.   Plaintiff is informed and believes that, near the time the emergency medical condition of each of Patients 1 through 5 (the "Post-Stabilization Patients") was stabilized and before Plaintiff provided post-stabilization services, Plaintiff contacted Defendants to request authorization of post-stabilization services.  For each of the Post-Stabilization Patients, Plaintiff either provided Defendants the treating physician's diagnosis and other relevant information reasonably necessary for the Defendants to decide whether to authorize post-stabilization care or to assume management of the Post-Stabilization Patients' care by prompt transfer, or Defendants did not request such information.

215.   Plaintiff contacted Defendants directly and/or through Defendants' contracting medical providers ("UM Designees").  Plaintiff is informed and believes that, at all times discussed herein, Defendants had written contracts with the UM Designees through which Defendants delegated authority for utilization management, including reviewing and timely responding to requests for authorization of post-stabilization care, authorizing or deeming authorized post-stabilization care at noncontracted hospitals, and arranging for transfer of stable patients from noncontracted hospitals to contracted hospitals, and thus the UM Designees are the actual agents of Defendants that perform these functions with Defendants' knowledge and consent.

COMPLAINT; DEMAND FOR JURY TRIAL

216.   Plaintiff also is informed and believes that Defendants communicated to Plaintiff in telephone calls and written materials, including member identification cards, provider manuals and/or web site, to contact the UM Designees to request and obtain authorization of post-stabilization care, and thus caused Plaintiff to believe that the UM Designees are the ostensible agents of Defendants that perform these functions with Defendants' knowledge and consent.

217.   Plaintiff further is informed and believes that Defendants ratified the decisions of the UM Designees by issuing payments based on the authorizations and/or deemed authorizations issued by the UM Designees.

218.   Plaintiff is informed and believes that Defendants, through their designated UM Designees, authorized Plaintiff to provide post-stabilization services to Patients 1 through 5 at Keck and/or failed to respond to request for authorization within 30 minutes, and thus Defendants had the opportunity to transfer the Patients to another hospital with a written contract with Defendants, but Defendants did not do so.

219.   Plaintiff is informed and believes that it thus provided post-stabilization services to the Post-Stabilization Patients pursuant to authorizations and deemed authorizations from Defendants.

220.   Plaintiff submitted complete claims for reimbursement to Defendants for such services.

221.   Defendants paid Plaintiff less than reasonable value for the services provided to Patients 1 through 5.

222.   Plaintiff is informed and believes that Defendants paid Plaintiff 100% of the Medicare rate for many of the claims for reimbursement for the services provided to Patients 1 through 5, including specifically the claim for Patient 3.  The Medicare rate Defendants paid is substantially less than the reasonable charges for such services.

223.   Indeed, the Department of Managed Health Care has stated,

> "the reimbursement of non-contracted providers based solely on Medicare and MediCal payment rates would be inconsistent with California law.  Non-contracted providers

COMPLAINT; DEMAND FOR JURY TRIAL

> are entitled to compensation equivalent to the reasonable value of the services rendered. Both Medicare and MediCal-fee schedules are designed to pay less than the prevailing value of health care services."

A true and correct copy of Department of Managed Health Care's ("DMHC") Response to Comment 10 to "Claims Settlement Practices and Dispute Resolution Mechanisms" Regulations, 3rd Comment Period Ending April 30, 2003, is enclosed hereto as Exhibit A and incorporated herein as reference.

224. On information and belief, Defendants paid Plaintiff <u>less</u> than 100% of the Medicare rate for many of the claims for reimbursement for the post-stabilization services provided to Patients 1 through 5, including specifically the claims for Patients 1, 2, 4, and 5.

225. Defendants damaged Plaintiff in an amount to be proved at trial, not less than $1,813,988.47.

Elective Services

226. State law <u>requires</u> health care service plans, such as LA Care, operating a health maintenance organization to reimburse each complete claim, or portion thereof, no later than forty-five working days after the date of receipt of the complete claim. (Health and Safety Code § 1371; and Title 28 Cal. Code Regs. § 1300.71(g).)

227. DMHC regulations specifically define the term "Reimbursement of a Claim," in the case of noncontracted providers and contracted providers without a written contract as "the payment of the reasonable and customary value for the health care services rendered based upon statistically credible information that is updated at least annually and takes into consideration: (i) the provider's training qualifications, and length of time in practice; (ii) the nature of the services provided, (iii) the fees usually charged by the provider; (iv) prevailing provider rates charged in the general geographic area in which the services were rendered; (v) other aspects of the economics of the medical provider's practice that are relevant; and (vi) any unusual circumstances in the case...." (Title 28 Cal. Code Regs. § 1300.71(a)(3) (hereinafter referred to as "Rule 1300.71(a)(3) (defining "Reimbursement of a Claim").)

228.   The DMHC's regulations were intended to protect noncontracted providers and providers without a written contract, such as the Plaintiff, from the risk of financial injury caused by health care service plans' failure to timely pay the reasonable value of health care services.

229.   The Hospitals are informed and believe that Defendants violated Health and Safety Code section 1371, Rule 1300.71(g) and Rule 1300.71(a)(3) by failing to pay the reasonable and customary value of the elective services the Hospitals provided to Patients 5 through 13 ("Elective Services Patients").

230.   In particular, the Hospitals are informed and believe that Defendants failed to pay the claims at issue based upon statistically credible information that is updated at least annually and takes into consideration: (i) the provider's training qualifications, and length of time in practice; (ii) the nature of the services provided, (iii) the fees usually charged by the provider; (iv) prevailing provider rates charged in the general geographic area in which the services were rendered; (v) other aspects of the economics of the medical provider's practice that are relevant; and (vi) any unusual circumstances in the case.

231.   Defendants paid Keck less than reasonable value for the services provided to Patients 5 through 13.

232.   On information and belief, Defendants paid Plaintiff 100% of the Medicare allowable rate for some of the claims for reimbursement for the services provided to Patients 5 through 13, including specifically the claims for Patients 7 through 10, 12 and 13.   The Medicare Allowable rate Defendants paid is less than the reasonable charges for such services.

233.   Indeed, the Department of Managed Health Care has stated,

> "the reimbursement of non-contracted providers based solely on Medicare and MediCal payment rates would be inconsistent with California law.   Non-contracted providers are entitled to compensation equivalent to the reasonable value of the services rendered.   Both Medicare and MediCal-fee schedules are designed to pay less than the prevailing value of health care services."

COMPLAINT; DEMAND FOR JURY TRIAL

A true and correct copy of Department of Managed Health Care's ("DMHC") Response to Comment 10 to "Claims Settlement Practices and Dispute Resolution Mechanisms" Regulations, 3rd Comment Period Ending April 30, 2003, is enclosed hereto as Exhibit A and incorporated herein as reference.

234.   On information and belief, Defendants paid Plaintiff less than 100% of the Medicare allowable rate for many of the claims for reimbursement for the services provided to the Elective Services Patients, including Patients 5 and 6. The Medicare rate for these services is substantially less than the reasonable value of such services.

235.   As a result, Defendants damaged Plaintiff in an amount not less than $167,336.16 for the hospital services provided at Keck and $103,119.29 for the hospital services provided at Norris.

Allegations Applicable to All Service Types – Emergency, Post-Stabilization and Elective.

236.   Defendants unlawfully interfered with Plaintiff's protected property interests by failing to provide adequate procedural safeguards to ensure Plaintiff receives the reasonable reimbursement to which it is entitled for emergency, post-stabilization, and elective services.  Plaintiff is informed and believes:

     i.   Defendants make decisions about payment of Plaintiff's claims for reimbursement for all hospital services in a secret process.

     ii.   Defendants do not disclose to Plaintiff all information Defendants consider when determining the amount Defendants reimburse to Plaintiff on each claim for reimbursement.

     iii.   Defendants do not disclose to Plaintiff the standards they apply when making a determination as to how much to reimburse Plaintiff for its services.

     iv.   Defendants do not attempt to reimburse Plaintiff's a reasonable amount for the hospital services Plaintiff provides and do not engage

in fact-finding to determine the reasonable value of Plaintiff's hospital services to be reimbursed.

    v.   Defendants reimburse Plaintiff's claims knowing the amounts Defendants pay are less than reasonable value.

    vi.   Defendants do not follow a fair decision-making process for determining reasonable and customary value of Plaintiff's services in that they do not allow Plaintiff the opportunity to provide evidence and testimony, to review Defendant's evidence and testimony, and to cross-examine, impeach and rebut witnesses.

    vii.   Defendants' determinations of reasonable value are made by decision makers who are not independent and thus who are subject to reprisal from Defendants.

    viii.   Defendants do not provide Plaintiff an opportunity for a fair or impartial review or appeal of Defendants' reimbursement decisions.

    ix.   Defendants' appeal process essentially results in a "rubber stamp" of the previous decision without meaningful review or consideration of relevant information.

    x.   Defendants' appeal process does not involve an independent review by an independent and impartial decision maker as to the reasonableness of Defendants' reimbursement.

    xi.   Defendants' appeal process does not ensure that the original decision is reviewed by a reviewer who was not involved in the original decision.

    xii.   Defendants' appeal process does not ensure that reviewers have no direct or indirect financial interest in the outcome of the decision on appeal, such as fear of loss of employment.  Essentially, Defendants review Defendants' own prior decisions, and Defendants have an incentive to not pay reasonable value for Plaintiff's hospital services.

COMPLAINT; DEMAND FOR JURY TRIAL

237.   Defendants unlawfully interfered with Plaintiff's protected property interests by failing to provide substantive due process by reimbursing Plaintiff the reasonable value of emergency, post-stabilization, and elective hospital services.

238.   Defendants operate a health care service plan through which Patients 1 through 13 obtain health care coverage, and thus cause Plaintiff to provide emergency services pursuant to the requirements of Health and Safety Code section 1371.4; post-stabilization services pursuant to the Health and Safety Code section 1262.8; and elective services pursuant to Health and Safety Code section 1371, Rule 1300.71(g) and Rule 1300.71(a)(3).  Defendants' failure to reimburse Plaintiff the reasonable charges for such services constitutes an improper taking in violation of the Fifth and Fourteenth Amendments of the United States Constitution.

239.   Defendants systematically and regularly fail to pay the reasonable value of emergency, post-stabilization, and elective services, such as the services Plaintiff provided to Patients 1 through 13, as a matter of procedure, policy and/or custom, and in bad faith.

240.   Defendants' conduct was intentional, grossly negligent, or amounted to reckless or callous indifference to Plaintiff's constitutional and legal rights.

241.   Plaintiff seeks a declaration as to the reasonable value of emergency, post-stabilization and elective services Plaintiff will provide enrollees of Defendants' health care service plans in the future.

242.   Plaintiff seeks a permanent injunction requiring Defendants to provide adequate procedural safeguards to ensure Plaintiff receives the reasonable reimbursement to which it is entitled for emergency, post-stabilization, and elective services.

243.   Plaintiff will suffer irreparable injury if the Court does not enjoin Defendants from continuing their practice of not paying reasonable value for Plaintiff's hospital services.  Plaintiff requires reasonable reimbursement for its services to continue its operations and provide medically necessary services to the patients it

serves.   Moreover, Plaintiff cannot obtain full compensation for the significant administrative and financial burdens imposed by Defendants' ongoing underpayments, including requiring Plaintiff to write and submit appeals and Government Claims letters, which Defendants repeatedly and improperly deny, and further requiring Plaintiff to pursue litigation to obtain reasonable reimbursement.   Such administrative and financial burdens draw resources away from Plaintiff's central mission of providing patient care.

244.   This irreparable injury outweighs any harm to Defendants resulting from orders to provide adequate procedural safeguards as the cost of providing such safeguards is minimal compared to the damage Plaintiff has and will suffer absent injunctive relief.

245.   Such relief will not be adverse to the public interest. To the contrary, the public interest is served by ensuring Plaintiff receives reasonable reimbursement for the emergency, post-stabilization, and elective hospital services it provides so that the Plaintiff's Hospitals will continue to operate and be available to patients in need of medically necessary services.

246.   Such relief should be granted because Plaintiff has a substantial likelihood of success on the merits—Plaintiff is legally entitled to reimbursement by Defendants of the reasonable value of emergency, post-stabilization, and elective hospital services it provided to Defendants' enrollees, and Defendants both failed to pay the Plaintiff the reasonable value of the services provided and failed to comply with the constitutional standards of procedural due process.

## **PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiff prays for judgment as follows:

1.      For damages to be proved at trial amounting to $2,038,788.53;

2.      For a declaration as to the reasonable value of Plaintiff's emergency, post-stabilization, and elective services;

3.      Issuance of a permanent injunction:

COMPLAINT; DEMAND FOR JURY TRIAL

a. Requiring Defendants to disclose to Plaintiff Defendants' methodology for determining reasonable and customary values for hospital services;

b. Requiring Defendants to disclose to Plaintiff the standards Defendants apply when deciding as to how much to reimburse Plaintiff for its services.

c. Requiring Defendants to disclose to Plaintiff all information Defendants consider when determining the amount Defendants reimburse for Plaintiff's services;

d. Requiring Defendants to reimburse Plaintiff a reasonable amount for the hospital services Plaintiff provides;

e. Requiring Defendants to engage in fact-finding to determine the reasonable value of Plaintiff's hospital services to be reimbursed.

f. Requiring Defendants to follow a fair decision-making process for determining reasonable and customary value of Plaintiff's services, including allowing Plaintiff the opportunity to provide evidence and testimony, to review Defendant's evidence and testimony, and to cross-examine, impeach and rebut witnesses;

g. Requiring Defendants' determinations of reasonable value to be made by independent decision makers who are not subject to reprisal from Defendants;

h. Requiring Defendants to provide Plaintiff an opportunity for fair and impartial review and appeal of Defendants' reimbursement decisions;

i. Requiring Defendants to engage in meaningful review and consideration of relevant information through the appeal process;

j. Requiring Defendants' appeal process to involve an independent review by an independent and impartial decision maker as to the reasonable and customary value of Plaintiff's hospital services, as

COMPLAINT; DEMAND FOR JURY TRIAL

1    well as the reasonableness of Defendants' reimbursement for those
2    services;

3        k. Requiring Defendants' appeal process to ensure the original decision
4    is reviewed by a reviewer who was not involved in the original
5    decision;

6        l. Requiring Defendants' appeal process to involve a reviewer that has
7    no direct or indirect financial interest, such as fear of loss of
8    employment, in the outcome of the decision on appeal;

9    4.    For costs to the extent allowed by law; and

10   5.    For such other and further relief as this Court may deem just and proper.

11   <u>**DEMAND FOR JURY TRIAL**</u>

12       Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands
13   trial by jury in this action.

14

15   DATED:  June 8, 2023            HELTON LAW GROUP, APC

16

17       By:       /s/ Kim Worobec
18       KIM WOROBEC
    kworobec@helton.law
19       RYAN JACOBSON
    rjacobson@helton.law
20       Attorneys for Plaintiff
21       UNIVERSITY OF SOUTHERN
    CALIFORNIA on behalf of its KECK
22       HOSPITAL OF USC and on behalf of its
23       USC NORRIS COMPREHENSIVE
    CANCER CENTER

24

25

26

27

28

COMPLAINT; DEMAND FOR JURY TRIAL